**Colorado Federal District Court**

F I L E D
UNITED STATES DISTRICT COURT
DENVER, COLORADO

JUN 29 2018

JEFFREY P. COLWELL
CLERK

The Shaivite Temple of Colorado

Rev. Ryan "Sasha" Gallagher
1690 Monterey Way
Fountain, Co 80817

V                                 '18 - CV - 01674

Drug Enforcement Administration (DEA)

James "Jim" Arnold

Susan A Gibson

Deputy Admin of Diversion Control
DEA Diversion Control
Drug Enforcement Administration
US Department of Justice
Washington, DC 20530

## Request for Judicial Review/Complaint

Ryan Gallagher, Pro Se, hereby files this Complaint and makes these allegations based on the fact that my Processes are not being followed properly—against Defendants, Drug Enforcement Agency ("DEA" or "Defendant"), as well as Susan A Gibson (or "Defendant 2") Jim Arnold (or "Defendant 3"). I ask that the court consider the fact that I am not a lawyer, but am alleging violations of various rights, which after discovery will be blatantly clear. Cruz v. Beto 405 U.S. 319 (1972)

I am simply asking the Court to review the DEA's Religious Exemption process in regards to the Petition of the Shaivite Temple of Colorado. I Submitted a Petition as per the DEA Guidelines, found in this link, on October 27th 2017, and the DEA has failed to respond as of May 19th 2018.
https://www.deadiversion.usdoj.gov/pubs/rfra_exempt_022618.pdf

October 2017, I contacted DOJ ODLP via their Email (Picture attatched) and they responded stating that Demetra Ashley would give me a response. Demetra Ashley was in the original RFRA Exemption Guidelines, but after receiving my Petition she Retired, and was replaced by Susan A Gibson. I never recieved a response from Demetra Ashley.

November 24th 2017, I receive this misleading email from the ODLP@USDOJ.gov email, and my Petition is never responded to:

*We have received your email(s). Please do not send any further repeat correspondence.*

*Thank you - Lynnette*

April 25th 2018, I received this email after asking the DEA FOIA, DOJ FOIA, etc, to forward my Petition to Susan A Gibson in March 2018:

*Dear Mr. Gallagher:*

*Your petition has been received. The matter is pending review. We will notify you when a decision has been made or if we require additional information.*

*James "Jim" Arnold*

*Chief, Liaison & Policy*

*Diversion Control Division*

*DEA Headquarters*

*202-353-1414 (Desk)*

DEAs rules, that they aren't following.

D. Processing Timeframes

It is important to act expeditiously on applications for Schedule I research. The timeframes for DEA's and FDA's processing of Schedule I research applications are specified in the regulations. DEA forwards complete Schedule I research protocols to the FDA within seven days of receipt; FDA notifies DEA of its determination regarding the merits of the protocol within 30 days; and DEA issues a certificate within 10 days of receiving the FDA's notice. 21 C.F.R. 1301.32(c). It should be noted that although many clinical researchers may be subject to a standardized protocol, thereby streamlining the process, some researchers must also meet institutional and State requirements prior to approval. DEA works closely with researchers to assist with the expeditious completion of their protocol submission and registration application.

Gallagher v. DEA 3: 2017cv00734
Gallagher v. Rosenberg 1:16-cv-0117
In re: Ryan Gallagher 18-10407
Washington v. Sessions 1:17-cv-05625
Craker v. DEA No. 09-1220 (1st Cir 2013)

Linder v. US, 268 US 5 (1925)
Gonzales v. Raich, 545 US 1 (2005)
Gonzales v. O Centro, 546 US 418 (2006)
US v. Stanley, 483 US 669 (1987)
Normaco v. DEA, 375 F.3d 1148 (DC 2004)

I.    **Introduction**

i.    To get the Court quickly up to date on Case Law, I cite **Olsen V DEA** 878 F.2d 1458 279 U.S.App.D.C. 1, 58 USLW 2023 as well as **Gonzales v. O Centro Espírita Beneficente União do Vegetal**, 546 U.S. 418 (2006); **Marbury v. Madison**, 5 U.S. 137 (1803). Olsen did not have the benefit of the 2016 Federal Registration (Catalent, etc), and did not have a Human Rights Case open.

Hemp Industries Association v. DEA No. 03-71366, 03-71693 (2004)
United States v. Forbes, 806 F. Supp. 232 (D. Colo 1992)
ICCPR, G.A. res 2200A (XXI), 21 UN GAOR Supp. (No 16) at 52, UN Doc A/6316 (1966), 999, UNTS12

*In an effort to prompt a response from the DEA, Olsen unsuccessfully sued in the Eleventh Circuit to compel agency action. Olsen v. DEA, 776 F.2d 267 (11th Cir.1985) (affirming district court's dismissal of Olsen's complaint), cert. denied, 475 U.S. 1030, 106 S.Ct. 1236, 89 L.Ed.2d 344 (1986). Thereafter, in January 1986, Olsen petitioned the U.S. District Court for the District of Columbia for a writ of mandamus, and that court, in March 1986, directed the DEA to show cause why the writ should not issue.*

-Olsen V DEA 878 F.2d 1458, 279 U.S.App.D.C. 1, 58 USLW 2023

Church of Lukumi Babalu Ay v. City of Hialeah, 508 US 520 (1993)
Masterpiece Cakeshop v. CCRC, 584 US — (2018)

ii. Article XVIII, Amendment 64, Section 2 of the Colorado State Constitution, states in the explanation of Definitions "Unless the Context otherwise Requires" in explanation of all definitions, yet the Marijuana Enforcement Agency claims that they only exist to review Applications for Recreational and Medical Marijuana, not "Unless the Context otherwise Requires", see USC Title 42 Chapters 21B and 21C. Amendment 64 can be found in Exhibit S.

iii. Article XVIII, Amendment 64, Section 1 of the Colorado State Constitution, states in the explanation of the law itself, that "Marijuana shall be taxed like Alcohol". The Colorado State Alcohol Code, Article 47, Title 12 CRS, Part I General Provisions, 12-14-106, Exemptions, Section 1, states "The provisions of this Article shall not apply to the sale or Distribution of Sacramental wines sold and used for Religious Purposes", see Walz v. Tax Comm'n of City of New York 397 U.S. 664 (1970). Colorado Alcohol Code can be found in Exhibit S.

iv. For Guidance in this case, I ask the Court to review the DEA RFRA Exemption Process.
DEA Processing Guidelines
RFRA Exemption Guidelines
https://www.deadiversion.usdoj.gov/pubs/rfra_exempt012209.pdf
D. Processing Timeframes
*It is important to act expeditiously on applications for Schedule I research. The timeframes for DEA's and FDA's processing of Schedule I research applications are specified in the regulations. DEA forwards complete Schedule I research protocols to the FDA within seven days of receipt; FDA notifies DEA of its determination regarding the merits of the protocol within 30 days; and DEA issues a certificate within 10 days of receiving the FDA's notice. 21 C.F.R. 1301.32(c). It should be noted that although many clinical researchers may be subject to a standardized protocol, thereby streamlining the process, some researchers must also meet institutional and State requirements prior to approval. DEA works closely with researchers to assist with the expeditious completion of their protocol submission and registration application.*

v. The 1st amendment was incorporated into the States, and is basically a "person" for legal purposes. So the 1st amendment is a separate plaintiff from myself **Everson v. Board of Education,** 330 U.S. 1 (1947)

**vi.** The DEA is inhibiting Liberty; "The fundamental theory of liberty upon which all governments of this Union rest excludes any general power of the State to standardize its children by forcing them to accept instruction from public teachers only." *Pierce v. Society of Sisters*, 268 U.S. 510 (1925)

**vii.** I would like to point out that the Law itself actually does provide a route for keeping the Government and Religion unentangled, the DEA just has to follow their own rules. What they are SUPPOSED to be doing right now is not judging if our Religion Conflicts with their Goals, they are simply supposed to be determining if our Religion is (1) Sincere (2) a Religious Belief (3) and is Burdened by the Controlled Substances Act. And if those 3 Conditions are met, they are supposed to grant Exemption.

**viii.** From there, Petitions can be submitted to solve the Entanglement Problem, as per #6 in the DEA RFRA Guidelines
6. Applicability of DEA Regulations.
A Petitioner whose petition for Religious Exemption from the Controlled Substances Act is granted remains bound by all applicable laws and Controlled Substances Act regulations governing registration, labeling and packaging, quotas, recordkeeping and reporting, security and storage, and periodic inspections, among other things. See 21 C.F.R. Sections 1300-1316. A Petitioner who seeks exemption from applicable CSA regulations (as opposed to the CSA itself) may petition under C.F.R. Section 1307.03. Such petition must separately address each regulation from which the petitioner seeks exemption and provide a statement of the reasons for each exemption sought.

**ix.** We are growing "Low THC" Marijuana, for THCv content, not for THC content. And I am breeding strains for their THCv Content. Meaning that we are growing "Hemp" and we are making "Industrial Hemp", with High THCv and Low or No THC.
*(2) Industrial hemp*
*The term "industrial hemp" means the plant Cannabis sativa L. and any part of such plant, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis*

**x.** 'it is a familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers.' *Church of the Holy Trinity v. United States*, 143 U.S. 457 (1892)

**xi.** "The global need to prevent chemical warfare does not require the Federal Government to reach into the kitchen cupboard, or to treat a local assault with a chemical irritant as the deployment of a chemical weapon." *Bond v. United States*, 572 U.S. ___ (2014)

**xii.** "We do not want the government deciding what is political truth — for fear that the government might persecute those who criticize it. Instead, in a democracy, the voters should decide." *Susan B. Anthony List v. Driehaus*, 573 U.S. ___ (2014)

**xiii.** Sincere Religious Belief; and
All Religions deserve exemptions
(via Wisconsin v. Yoder U.S. 205 (1972))
"Within that phrase would come all sincere religious beliefs which are based upon a power or being, or upon a faith to which all else is subordinate or upon which all else is ultimately dependent. The test might be stated in these words: a sincere and meaningful belief which occupies in the life of its possessor a place parallel to that filled by the God of those admittedly qualifying for the exemption comes within the

statutory definition. This construction avoids imputing to Congress an intent to classify different religious beliefs, exempting some and excluding others, and is in accord with the well established congressional policy of equal treatment for those whose opposition to service is grounded in their religious tenets."

*xiv.* Lemon v. Kurtzman, 403 U.S. 602 (1971)
a) *The statute must have a secular legislative purpose. (Also known as the Purpose Prong)*
b) *The principal or primary effect of the statute must not advance nor inhibit religion. (Also known as the Effect Prong)*
c) *The statute must not result in an "excessive government entanglement" with religion. (Also known as the Entanglement Prong)*

## II.    **Claim**

One of the most important indicia of 'a religion' is that the particular collection of ideas and/or practices involves belief in the supernatural, that is to say, belief that reality extends beyond that which is capable of perception by the senses. If that be absent, it is unlikely that one has 'a religion'.

(1) Ultimate Ideas: Fundamental Questions about life, purpose and death

(2) Metaphysical Beliefs: Beliefs addressing a reality that transcends the physical and immediate apparent world

(3) Moral and Ethical System: Proscription of a particular manner of acting or a way of life that is moral or ethical

(4) Comprehensive Beliefs: An overarching array of beliefs that coalesce to provide the believer with answers to many of the problems and concerns that confront humans

(5) Accouterments of Religion: The presence of various external signs of Religion

A Church is not much different in Nature from a State, see Texas v. White 74 U.S. 700 (1868). Religion is a form of COMITY INTER GENTES from AFFLATUS. The Separation of Church and State in the ESTABLISHMENT CLAUSE exists because of the fact that Religion used to be the State, as it is now in Vatican City and the Holy See, Churches may even be a party to CONCORDAT see Ponce v. Roman Catholic Church 210 U.S. 296 (1908); Respublica v. De Longchamps, 1 U.S. 111 (1784); Serbian Orthodox Diocese v. Milivojevich, 426 U. S. 696 (1976); Presbyterian Church v. Hull Church, 393 U.S. 440 (1969), and allows American's to practice not only one Religion, but any Religion, free from persecution. Not only is there an ANTINOMY between the RELIGIOUS FEEDOM RESTORATION ACT / RELIGIOUS LAND USE AND INSTITUATIONALIZED PERSONS ACT and the CONTROLLED SUBSTANCES ACT, there is a CONFLICTUS LEGEM between the Plaintiff's Church and the Federal State arising from the ANTINOMY, which can be resolved by the FREE EXERCISE CLAUSE. RELIGIOUS ACCESSION also needs to be considered in the progress of History, Technology and Knowledge. "The term "religious exercise" includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief", see 42 U.S. Code § 2000cc–5 (7) (a). "the general characteristics of Schedule I substances cannot carry the day", see Gonzales v. O Centro Espírita Beneficente União do Vegetal 546 U.S. 418 (2006); Church of Holy Light of the Queen V. Eric Holder, Jr., No. 13-35058 (9th Cir. 2014). "Congress must first enact a law criminalizing an activity, attach a penalty, and give the Federal courts Jurisdiction", see Hudson v. United States 522 U.S. 93 (1997). "Congress shall make no laws prohibiting the Free Exercise of Religion", see FREE EXERCISE CLAUSE, I AMENDMENT. "If a

Government confronts an individual with a choice that pressures the individual to forgo a Religious practice, whether by imposing a penalty or withholding a benefit, then the Government has burdened the individuals free Religious Exercise.", see Sherbert v. Verner 374 U.S. 398 (1963). "Even neutral laws can be used unconstitutionally", see Yick Wo v. Hopkins 118 U.S. 356 (1886); 42 U.S. Code § 2000bb (a) (2). "failing to accommodate petitioners' exercise of their "nonmainstream" religions in a variety of ways", see Cutter v. Wilkinson, 544 U.S. 709 (2005). "conduct business in accordance with their religious beliefs", see Burwell v. Hobby Lobby Stores, Inc. 573 U.S. _ (2014).

The Defendants would likely use Reynolds v. United States 98 U.S. 145 (1878) in their Defense, but if we are going to go that route, Reynolds would be overturned if it were brought to the court today. Reynolds was decided based on USC Ch126, 12 S 501, Morrill Anti-Bigamy Act which was, and is well understood to have been, targeting Mormons, and was A POSTERIORI an illegal Act of Congress and is VOID AB INITIO, see Church of the Lukumi Babalu Aye, Inc. v. Hialeah, 508 U.S. 520 (1993). A FORTIORI Using Reynolds as precedent to allow Congress to prohibit Free Exercise is ULTRA VIRES; Hilton v. Guyot, 159 U.S. 113 (1895); Leary v. United States, 395 U.S. 6 (1969); United States v. Alfonso D. Lopez, Jr., 514 U.S. 549 (1995); United States v. Alvarez, 567 U.S. _ (2012). This case is not an argument that the US Government does not have jurisdiction of the Church or its members and is not a statement of ABJURE, it is an argument that Congress has overstepped its role in the Constitution, that Church law is to be considered in these courts, and that arguments from Reynolds should no longer be considered persuasive to US Courts, see Gonzalez v. Roman Catholic Archbishop of Manila 280 U.S. 1 (1929).

Due to the ANTINOMY of the CONTROLLED SUBSTANCES ACT and The FREE EXERCISE CLAUSE, the RELIGIOUS FREEDOM RESTORATION ACT and the RELIGIOUS LAND USE AND INSTITUTIONALIZED PERSONS ACT, the ABOLITIO LEGIS of the CONTROLLED SUBSTANCES ACT is necessary, it must be ABROGATED as a matter of DE FACTO Right and PENUMBRA.

The Latin phrase SUB ROSA means "under the rose", and is used in English to denote secrecy or confidentiality, similar to the Chatham House Rule. The literal rose and its essence or attar has also played a role in religious and spiritual rites which often would have been held in secret.

Persecution under the modern ULTRA VIRES actions of the US Congress has forced many religions and religious practitioners to operate SUB ROSA or in CLANDESTINE settings AB INVITO, in violation of the FREE EXERCISE CLAUSE which is AD GRAVE DAMNUM to these Religions, see Church of the Lukumi Babalu Aye, Inc. v. Hialeah 508 U.S. 520 (1993). During this time of ULTRA VIRES, CAUSA SINE QUA NON religious practitioners have been CASTIGATED, COERCED and brought to CARCER with no method of ASYLUM established. CESSANTE CAUSA.

During the initial development of the Christian Church under the Roman Empire followers often had to practice in secret. Official policy under Trajan was to provide Christians with the choice between recanting and execution. In 1636, expelled from Massachusetts in the winter, former Puritan leader Roger Williams issued an impassioned plea for freedom of conscience. He wrote, "God requireth not an uniformity of Religion to be inacted and enforced in any civill state; which inforced uniformity (sooner or later) is the greatest occasion of civill Warre, ravishing of conscience, persecution of Christ Jesus in his servants, and of the hypocrisie and destruction of millions of souls." Williams later founded Rhode Island on the principle of religious freedom. He welcomed people of religious belief, even some regarded as dangerously misguided, for nothing could change his view that "forced worship stinks in God's nostrils.".A clandestine church (Dutch: schuilkerk), defined by historian Benjamin J. Kaplan as a "semi-clandestine church", is a house of worship used by religious minorities whose communal worship is tolerated by those of the majority faith

on condition that it is discreet and not conducted in public spaces. Schuilkerken are commonly built inside houses or other buildings, and do not show a public façade to the street. "Here, however, defendants challenge plaintiffs' sincerity, citing plaintiffs' decision to conduct ceremonies in secret until the Supreme Court ruling in favor of the UDV plaintiffs. Plaintiffs' secrecy does not show a lack of sincerity. Instead, it shows that plaintiffs remained committed to practicing their religion despite the threat of criminal prosecution and loss of professional status.", see Church of Holy Light of the Queen V. Eric Holder, Jr., No. 13-35058 (9th Cir. 2014) "Moreover, the latter ordinances' various prohibitions, definitions, and exemptions demonstrate that they were "gerrymandered" with care to proscribe religious killings of animals by Santeria church members but to exclude almost all other animal killings. They also suppress much more religious conduct than is necessary to achieve their stated ends. The legitimate governmental interests in protecting the public health and preventing cruelty to animals could be addressed by restrictions stopping far short of a flat prohibition of all Santeria sacrificial practice...The resulting syncretion, or fusion, is Santeria, "the way of the saints." The Cuban Yoruba express their devotion to spirits, called oris has, through the iconography of Catholic saints, Catholic symbols are often present at Santeria rites, and Santeria devotees attend the Catholic sacraments. 723 F. Supp. 1467, 1469-1470 (SD Fla. 1989); 13 Encyclopedia of Religion 66 (M. Eliade ed. 1987); 1 Encyclopedia of the American Religious Experience 183 (C. Lippy & P. Williams eds. 1988)...The sacrifice of animals as part of religious rituals has ancient roots. See generally 12 id., at 554-556. Animal sacrifice is mentioned throughout the Old Testament, see 14 Encyclopaedia Judaica 600, 600-605 (1971), and it played an important role in the practice of Judaism before destruction of the second Temple in Jerusalem, see id., at 605-612. In modern Islam, there is an annual sacrifice commemorating Abraham's sacrifice of a ram in the stead of his son. See C. Glasse, Concise Encyclopedia of Islam 178 (1989); 7 Encyclopedia of Religion, supra, at 456...Santeria adherents faced widespread persecution in Cuba, so the religion and its rituals were practiced in secret. The open practice of Santeria and its rites remains infrequent. See 723 F. SUPP., It 1470; 13 Encyclopedia of Religion, supra, at 67; M. Gonzalez-Wippler, Santeria: The Religion 3-4 (1989)...Pichardo indicated that the Church's goal was to bring the practice of the Santeria faith, including its ritual of animal sacrifice, into the open...The court also concluded that an exception to the sacrifice prohibition for religious conduct would "'unduly interfere with fulfillment of the governmental interest'" because any more narrow restrictions-e. g., regulation of disposal of animal carcasses- would be unenforceable as a result of the secret nature of the Santeria religion. Id., at 1486-1487, and nn. 57-59...Although the practice of animal sacrifice may seem abhorrent to some, "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." Thomas v. Review Bd. of Indiana Employment Security Div., 450 U. S. 707, 714 (1981). Given the historical association between animal sacrifice and religious worship, see supra, at 524-525, petitioners' assertion that animal sacrifice is an integral part of their religion "cannot be deemed bizarre or incredible." Frazee v. Illinois Dept. of Employment Security, 489 U. S. 829, 834, n. 2 (1989).", see Church of the Lukumi Babalu Aye, Inc. v. Hialeah 508 U.S. 520 (1993)

"The purpose of separation of church and state is to keep forever from these shores the ceaseless strife that has soaked the soil of Europe in blood for centuries."
- James Madison, 4th president of the United States

OUTLINE OF THE CASE

All I have to do to get the case accepted by the court is prove Prima Facie (Not beyond a reasonable doubt) that my claim is plausible.

So, the first Cause of Action. According to the Supreme Court, Schedule I substances are not enough to bar a substance from Religious Use. The wording they used is that calling a substance Schedule I as an argument against Religious use "can not carry the day". https://supreme.justia.com/cases/federal/us/546/418/

My Religious rights are regularly violated by the DEA. I have been arrested, charged with both a Misdemeanor and a Felony and jailed (and won the case in the end, everything is dismissed), I have been arrested, had items seized and had a Narcotics Investigation opened (and won the case in the end, everything is dismissed). The fact that the DEA does not openly recognize the O Centro case, and make a Public Statement for lower Enforcement bodies, is dereliction of duty.

Laws must be Neutral and can not Overtly or Covertly ban Religions. The DEA allows large corporations to Manufacture, Import and Posses Schedule I and II Substances using DEA form 225, protocol can be found in 21 CFR 1301.18, the Constitution allows the regulation of Commerce, but not the Regulation of Religion. The Controlled Substances Act is not a Neutral Law.
https://supreme.justia.com/cases/federal/us/508/520/case.html
http://law.justia.com/cases/federal/appellate-courts/cadc/02-1211/02-1211a-2011-03-24.html

Second cause of Action, Gerrymandering causing Death. My brother died in 2013 at the age of 11, the final cause of death was Edema (brain swelling). There is solid research (the Doctors even agreed, which is laid out in an Affidavit) that Cannabinoids can reverse Edema. But doctors are either Unable or Unwilling to retrieve Cannabinoids for this purpose due to the current operations of the DEA. The University of Mississippi was a protected Monopoly until August 2016 for Marijuana, at which time the DEA admitted it was allowing this Monopoly and opened up registration to more companies (the DEA admission of this is included in the lawsuit). Mallinckdrot has been allowed to Synthesize Tetrahydrocannabinoids (THC derivatives) but, due to this Gerrymandering, Hospitals do not have access. My brother's Death certificate and Autopsy are included in the lawsuit, as well as the research papers proving he could have been saved. The files showing that they have allowed companies to Manufacture, Import and Posses these Substances is also included, along with case law for what legally defines a Monopoly.
https://www.federalregister.gov/documents/2016/08/12/2016-17955/applications-to-become-registered-under-the-controlled-substances-act-to-manufacture-marijuana-to
https://www.deadiversion.usdoj.gov/fed_regs/manufct/reg/2016/index.html
https://www.deadiversion.usdoj.gov/fed_regs/imprt/app/2016/index.html
https://www.justice.gov/atr/memorandum-antitrust-division-united-states-department-justice-amicus-curiae-support-application

Third Cause of Action, laws are not Amendments. The 18th Amendment started prohibition, and the Volstead Act was passed by Congress which put it into action. During Prohibition (and in the Volstead Act) Religious use of Alcohol was not Prohibited. If an Amendment did not have the power to violate Religion due to the 1st Amendment, then a mere law can not violate Religion. There is another point made in the third cause of action, but it would take up way more space to explain it here.
http://www.stateoffranklin.net/johnsons/chicago/volstead.pdf

Fourth Cause of Action, Rights retained by the People. I am challenging the Controlled Substances Act under Rule 5.1 of the Federal Rules of Civil Procedure, and as an Unconstitutional law, the Controlled Substances Act must be overturned. Any judge involved in protecting it is in violation of their oath.
https://supreme.justia.com/cases/federal/us/395/6/
https://supreme.justia.com/cases/federal/us/5/137/case.html

Fifth Cause of Action, violation of International Agreements. The United States is a party to various Treaties stating that 1. Religion can not be violated, 2. Religión can not be targeted, and; 3. Religions must be able to manufacture and use Religious items/materials.
http://www.un.org/en/universal-declaration-human-rights/
http://www.ohchr.org/EN/ProfessionalInterest/Pages/CCPR.aspx

http://www.un.org/documents/ga/res/36/a36r055.htm
http://www.ohchr.org/EN/Issues/FreedomReligion/Pages/FreedomReligionIndex.aspx
http://hrlibrary.umn.edu/gencomm/hrcom22.htm

In August 2016, the DEA opened up Registration for Federal Marijuana Growers, Importers, and Researchers.
https://www.federalregister.gov/documents/2016/08/12/2016-17955/applications-to-become-registered-under-the-controlled-substances-act-to-manufacture-marijuana-to

Catalent has already been approved to Import Tons of Marijuana
https://www.deadiversion.usdoj.gov/fed_regs/imprt/app/2017/fr0918_4.htm

https://www.youtube.com/watch?v=fOU7kVRwFxw

Here is what the Senate has to say about Marijuana
https://www.judiciary.senate.gov/imo/media/doc/07-13-16%20Weiss%20Testimony.pdf

Kratom not Scheduled after massive Twitter Response
https://www.federalregister.gov/documents/2016/10/13/2016-24659/withdrawal-of-notice-of-intent-to-temporarily-place-mitragynine-and-7-hydroxymitragynine-into

Lipomed can pretty much import anything
https://www.deadiversion.usdoj.gov/fed_regs/imprt/reg/2016/fr0119_2.htm

DOJ Anti-Trust Division says that the DEA has to accept new Manufactures and Importers so as not to be creating Monopolies.
https://www.justice.gov/atr/memorandum-antitrust-division-united-states-department-justice-amicus-curiae-support-application

United States v. E. C. Knight Co. 156 U.S. 1 (1895)
*Counsel contend that this definition, as explained by the derivation of the word, may be applied to all cases in which "one person sells alone the whole of any kind of marketable thing, so that only he can continue to sell it, fixing the price at his own pleasure," whether by virtue of legislative grant or agreement; that the monopolization referred to in the act of Congress is not confined to the common law sense of the term as implying an exclusive control, by authority, of one branch of industry without legal right of any other person to interfere therewith by competition or otherwise, but that it includes engrossing as well, and covers controlling the market by contracts securing the advantage of selling alone or exclusively all or some considerable portion of a particular kind or merchandise or commodity to the detriment of the public, and that such contracts amount to that restraint of trade or commerce declared to be illegal. But the monopoly and restraint denounced by the act are the monopoly and restraint of interstate and international trade or commerce, while the conclusion to be assumed on this record is that the result of the transaction complained of was the creation of a monopoly in the manufacture of a necessary of life.*

https://www.justice.gov/iso/opa/resources/3052013829132756857467.pdf

https://www.congress.gov/amendment/114th-congress/house-amendment/332

You may have heard some crazy quotes about how safe Marijuana is, such as "Aspirin is more dangerous than Marijuana" or "Potatoes are more dangerous than Marijuana" or "It would take 100 tons of Marijuana, smoked in 15 minutes to Overdose" and other crazy quotes. Those actually came from a DEA Judge, Judge Francis, and he backed up everything he said.
https://medicalmarijuana.procon.org/sourcefiles/Young1988.pdf

# III. **Events**

I Submitted a Request for an Exemption for our Church under the RFRA Guidelines set forth by the DEA on Oct 24th, 2017, and they are not responding. They also did not respond to the Ethiopian Zion Coptic Church until forced to by a Federal Court. The original Petition is for THCv, a Non-Scheduled Substance. It is not Scheduled in the United States or on the UN Psychotropics Convention, and is the Eucharist of the Lord God Shiva, the Earthly Form of Lord God Shiva.

I simply want the Court to review this process, and as they were forced to respond to the Ethiopian Zion Coptic Church by a Federal Court, I assume that it will have to be done that way again, because I have received no response.  **Olsen V DEA** 878 F.2d 1458 279 U.S.App.D.C. 1, 58 USLW 2023

After 2013-2014, the death of Dr. Sasha Shulgin and Dr. Jeremy Kerr occurred. Jeremy Kerr was the Pastor of the Church of Neuroscience, which has now been absorbed by the Shaivite Temple. And Sasha Shulgin has been accepted by the Temple as a Saint for his Miracles that he Preformed during his lifetime; and 4-OH-MiPT, Miprocin, very closely related to Melatonin which is released during Meditation (Meditation was invented by the Lord God Shiva), has been interpreted by our Temple to be the Eucharist, the Flesh of the Lord God Soma. Shiva and Soma are 2 Separate Gods within 1 Religion, and I would argue to the DEA and the Court that having 2 or 3 Religions would not cause a person to fall outside the protections of the First Amendment, in fact something like the First Amendment is required in order for such Religions to Flourish. Many Syncretic Churches were formed in America. I mailed this to the DEA about 2 weeks before filing this case you are reading with the Court:



After mailing this I received a Phone call from DEA HQ stating "You can not mail White Powders to Federal buildings, we appreciate that you called us to warn us, but you can not do that. You will receive a phone call that Tuesday."

I then emailed them this:

*"The global need to prevent chemical warfare does not require the Federal Government to reach into the kitchen cupboard, or to treat a local assault with a chemical irritant as the deployment of a chemical weapon." Bond v. United States, 572 U.S. __ (2014)*

I did not receive a call that Tuesday, and instead had to contact the DEA myself via the DEA HQ phone number that called me. It took me calling all week until Friday to get an Email response from Jim Arnold stating:

*This matter is still pending.  If we need additional information we will be in touch.*

IF THEY CAN NOT COME ARREST ME THEN THE MATTER IS NO LONGER PENDING. I WANT TO GIVE THE COURT THE EXAMPLE OF THE MORMON CHURCH CREATED IN THE UNITED STATES, SPIRITUALISM, THE "I AM" ACTIVITY, SANTA RIA, SANTO DIAME, ETC ETC ETC

"There is no proof whatever to warrant such fears of malingering or deceit as those which the respondents now advance. Even if consideration of such evidence is not foreclosed by the prohibition against judicial inquiry into the truth or falsity of religious beliefs,

...

"Thus, the Amendment embraces two concepts -- freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be."

...

Id., pp. 310 U. S. 303-304. Freedom of thought, which includes freedom of religious belief, is basic in a society of free men. Board of Education by Barnette, 319 U. S. 624. It embraces the right to maintain theories of life and of death and of the hereafter which are rank heresy to followers of the orthodox faiths. Heresy trials are foreign to our Constitution. Men may believe what they cannot prove.

...

But it would hardly be supposed that they could be tried before a jury charged with the duty of determining whether those teachings contained false representations. The miracles of the New Testament, the Divinity of Christ, life after death, the power of prayer are deep in the religious convictions of many. If one could be sent to jail because a jury in a hostile environment found those teachings false, little indeed would be left of religious freedom. The Fathers of the Constitution were not unaware of the varied and extreme views of religious sects, of the violence of disagreement among them, and of the lack of any one religious creed on which all men would agree. They fashioned a charter of government which envisaged the widest possible toleration of conflicting views. Man's relation to his God was made no concern of the state. He was granted the right to worship as he pleased, and to answer to no man for the verity of his religious views. The religious views espoused by respondents might seem incredible, if not preposterous, to most people. But if those doctrines are

subject to trial before a jury charged with finding their truth or falsity, then the same can be done with the religious beliefs of any sect. When the triers of fact undertake that task, they enter a forbidden domain. The First Amendment does not select any one group or any one type of religion for preferred treatment. It puts them all in that position. Murdock v. Pennsylvania, 319 U. S. 105. As stated in Davis v. Beason, 133 U. S. 333, 133 U. S. 342:"

-United States v. Ballard, 322 U.S. 78 (1944)


## KEY POINT

**The UN Psychotropics Convention Does Not Cover Various Substances and the United States Government continues to arrest, attack, kill, maim, and hunt Religious Practitioners using these Substances which are not listed on the UN Psychotropics Conventionm even after being told to stop by the US Supreme Court in Gonzales V O Centro. This is the Modern American Witch Hunt. In the case of the Shaivite Temple of Colorado, it is primarily THCv.**


**THESE SUBSTANCES ARE NOT COVERED BY THE UN PSYCHOTROPICS CONVENTION AND THEREFOR FALL UNDER THE SAME RELIGIOUS PROTECTIONS AS HOASCA IN THE GONZALES CASE**


THCv

4-OH-MIPT

alpha-Ethyltryptamine (a-ET)

alpha-Methyltryptamine (a-MT)

5-Methoxy-N,N-

5-Methoxy-N,N-

2-(4-Iodo-2,5-dimethoxyphenyl) ethanamine (2C-I)

2-(2,5-Dimethoxy-4-

2C-B

2-(2,5-Dimethoxy-4-

2-(2,5-Dimethoxy-4-nitro-

2-(2,5-Dimethoxy-4-(n)-

2C-F

2C-G

4-OH-DET

4-OH-MET

5-MeO-MIPT

ETH-LAD

AL-LAD

DPT

MXE

6-APB

## It is a Federal Crime to Obstruct Religion

18 U.S. Code § 247 - Damage to religious property; obstruction of persons in the free exercise of religious beliefs

(a) Whoever, in any of the circumstances referred to in subsection (b) of this section—

(1) intentionally defaces, damages, or destroys any religious real property, because of the religious character of that property, or attempts to do so; or

(2) intentionally obstructs, by force or threat of force, any person in the enjoyment of that person's free exercise of religious beliefs, or attempts to do so;

shall be punished as provided in subsection (d).

(b) The circumstances referred to in subsection (a) are that the offense is in or affects interstate or foreign commerce.

(c) Whoever intentionally defaces, damages, or destroys any religious real property because of the race, color, or ethnic characteristics of any individual associated with that religious property, or attempts to do so, shall be punished as provided in subsection (d).

(d) The punishment for a violation of subsection (a) of this section shall be—

(1) if death results from acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill, a fine in accordance with this title and imprisonment for any term of years or for life, or both, or may be sentenced to death;

(2) if bodily injury results to any person, including any public safety officer performing duties as a direct or proximate result of conduct prohibited by this section, and the violation is by means of fire or an explosive, a fine under this title or imprisonment for not more that 40 years, or both;

(3) if bodily injury to any person, including any public safety officer performing duties as a direct or proximate result of conduct prohibited by this section, results from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon,

explosives, or fire, a fine in accordance with this title and imprisonment for not more than 20 years, or both; and

(4) in any other case, a fine in accordance with this title and imprisonment for not more than one year, or both.

(e) No prosecution of any offense described in this section shall be undertaken by the United States except upon the certification in writing of the Attorney General or his designee that in his judgment a prosecution by the United States is in the public interest and necessary to secure substantial justice.

(f) As used in this section, the term "religious real property" means any church, synagogue, mosque, religious cemetery, or other religious real property, including fixtures or religious objects contained within a place of religious worship.

(g) No person shall be prosecuted, tried, or punished for any noncapital offense under this section unless the indictment is found or the information is instituted not later than 7 years after the date on which the offense was committed.

IV.  **Whereby the Plaintiff Prays the Court,**

Order that the Defendants create a Religious Exemption Process better than that created by Gonzales V O Centro, mainly by applying Olsen V DEA as well as Pierce V Society of Sisters, Order the Defendants to Grant the Petition of the Plaintiff, and award Punitive Damages so as to deter the Defendants from engaging in this kind of Discriminatory activity again.

_____

Rev. Ryan "Sasha" Gallagher

## Guidance Regarding Petitions for Religious Exemption from the Controlled Substances Act Pursuant to the Religious Freedom Restoration Act

In recent years, the Drug Enforcement Administration (DEA) has seen an increase in requests from parties requesting religious exemptions from the Controlled Substances Act (CSA) to permit the use of controlled substances. The Religious Freedom Restoration Act (RFRA) provides that the "Government shall not substantially burden a person's exercise of religion" unless the Government can demonstrate "that application of the burden to the person is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-l. In **Gonzales** v. **O Centra Espirita Beneficente Uniao do Vegetal,** 126 S.Ct. 1211 (2006), the Supreme Court held that government action taken pursuant to the CSA is subject to RFRA. In order to obtain an exemption under RFRA, a party must, as a preliminary matter, demonstrate that its (1) sincere (2) religious exercise is (3) substantially burdened by the CSA. 42 U.S.C. § 2000bb et seq.

The guidelines that follow are an interim measure intended to provide guidance to parties who wish to petition for a religious exemption to the CSA:

1. *Filing Address.* All petitions for exemption from the Controlled Substances Act under RFRA shall be submitted in writing to Susan A. Gibson, Deputy Assistant Administrator, Diversion Control Division, Drug Enforcement Administration, 8701 Morrissette Drive, Springfield, Virginia 22152.

2. *Content of Petition.* A petition may include both a written statement and supporting documents. A petitioner should provide as much information as he/she deems necessary to demonstrate that application of the Controlled Substances Act to the party's activity would (1) be a substantial burden on (2) his/her sincere (3) religious exercise. Such a record should include detailed information about, among other things, (1) the nature of the religion {e.g., its history, belief system, structure, practice, membership policies, rituals, holidays, organization, leadership, etc.); (2) each specific religious practice that involves the manufacture, distribution, dispensing, importation, exportation, use or possession of a controlled substance; (3) the specific controlled substance that the party wishes to use; and (4) the amounts, conditions, and locations of its anticipated manufacture, distribution, dispensing, importation, exportation, use or possession. A petitioner is not limited to the topics outlined above, and may submit any and all information he/she believes to be relevant to DEA's determination under RFRA and the Controlled Substances Act.

3. *Signature.* The petition must be signed by the petitioner, who must declare under penalty of perjury that the information provided therein is true and correct. See *28 U.S.C. § 1746*.

4. *Acceptance of Petition for Filing.* Petitions submitted for filing are dated upon receipt by DEA. If it is found to be complete, the petition will be accepted as filed, and the petitioner will receive notification of acceptance. Petitions that do not conform to this guidance will not generally be accepted for filing. A petition that fails to conform to this guidance will be

Last updated: February 26, 2018

returned to the petitioner with a statement of the reason for not accepting the petition for filing. A deficient petition may be corrected and resubmitted. Acceptance of a petition for filing does not preclude DEA from making subsequent requests for additional information.

5. *Requests for Additional Information.* DEA may require a petitioner to submit such additional documents or written statements of facts relevant to the petition as DEA deems necessary to determine whether the petition should be granted. It is the petitioner's responsibility to provide DEA with accurate contact information. If a petitioner does not respond to a request for additional information within 60 days from the date of DEA's request, the petition will be considered to be withdrawn.

6. *Applicability of DEA Regulations.* A petitioner whose petition for a religious exemption from the Controlled Substances Act is granted remains bound by all applicable laws and Controlled Substances Act regulations governing registration, labeling and packaging, quotas, recordkeeping and reporting, security and storage, and periodic inspections, among other things. See *21 C.F.R. §§ 1300-1316*. A petitioner who seeks exemption from applicable CSA regulations (as opposed to the CSA itself) may petition under *21 C.F.R. § 1307.03*. Such petition must separately address each regulation from which the petitioner seeks exemption and provide a statement of the reasons for each exemption sought.

7. *Activity Prohibited Until Final Determination.* No petitioner may engage in any activity prohibited under the Controlled Substances Act or its regulations unless the petition has been granted and the petitioner has applied for and received a DEA Certificate of Registration. A registration granted to a petitioner is subject to subsequent suspension or revocation, where appropriate, consistent with CSA regulations and RFRA.

8. *Final Determination.* After the filed petition—along with all submissions in response to any requests for additional information—has been fully evaluated, the Deputy Assistant Administrator of the Diversion Control Division shall provide a written response that either grants or denies the petition. Except in the case of affirming a prior denial or when the denial is self-explanatory, the response shall be accompanied by a statement of reasons upon which the decision is based. This written response is a final determination under *21 U.S.C. § 877*.

9. *Application of State and Other Federal Law.* Nothing in these guidelines shall be construed as authorizing or permitting any party to take any action which such party is not authorized or permitted to take under other Federal laws or under the laws of the State in which he/she desires to take such action. Likewise, compliance with these guidelines shall not be construed as compliance with other Federal or State laws unless expressly provided in such other laws.

The 9th Amendment: "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."

## Supporting Case Law

Penumbra The rights guaranteed by implication in a constitution or the implied powers of a rule. The original and literal meaning of penumbra is "a space of partial illumination between the perfect shadow ... on all sidesand the full light" (Merriam Webster's Collegiate Dictionary, 10th ed., 1996). The term was created and introduced byastronomer Johannes Kepler in 1604 to describe the shadows that occur during eclipses. However, in legal terms penumbrais most often used as a metaphor describing a doctrine that refers to implied powers of the federal government. The doctrineis best known from the Supreme Court decision of griswold v. connecticut, 381 U.S. 479, 85 S. Ct. 1678, 14 L. Ed. 2d510 (1965), where Justice william o. douglas used it to describe the concept of an individual's constitutional right ofprivacy. The history of the legal use of the penumbra metaphor can be traced to a federal decision written by Justice stephen j.field in the 1871 decision of Montgomery v. Bevans, 17 F.Cas. 628 (9th C.C.D. Cal.). (At the time, Field was performingcircuit duty while a member of the Supreme Court.) Since the Montgomery decision, the penumbra metaphor has not beenused often. In fact, more than half of its original uses can be attributed to just four judges: oliver wendell holmes, jr., learned hand, benjamin n. cardozo, and William O. Douglas. In an 1873 article on the theory of torts, Justice Holmes used the term penumbra to describe the "gray area where logicand principle falter." In later decisions, Justice Holmes developed the penumbra doctrine as representing the "outer boundsof authority emanating from a law." Justice Holmes usually used the word in an attempt to describe the need to drawArbitrary lines when forming legislation. For instance, in the decision of Danforth v. Groton Water Co., Holmes referred toconstitutional rules as lacking mathematical exactness, stating that they, "[l]ike those of the Common Law, end in apenumbra where the Legislature has a certain freedom in fixing the line, as has been recognized with regard to the policepower" (178 Mass. 472, 476–77, 59 N.E. 1033, 1034 [1901]). Judge Hand expanded the meaning of the word in opinions written between 1915 and 1950 by using it to indicate the vagueborders of words or concepts. He used it to emphasize the difficulty in defining and interpreting statutes, contracts,Trademarks, or ideas. Justice Cardozo's use of the penumbra metaphor in opinions written between 1934 and 1941 was similar to Holmes'sapplication, but Justice Douglas took a different approach. Rather than using it to highlight the difficulty of drawing lines ordetermining the meaning of words or concepts, he used the term when he wanted to refer to a peripheral area or an indistinctboundary of something specific. Douglas's most famous use of penumbra is in the Griswold decision. In the Griswold case, appellants Estelle Griswold,executive director of the Planned Parenthood League of Connecticut, and Dr. C. Lee Buxton, a medical professor at YaleMedical School and director of the league's office in New Haven, were convicted for prescribing contraceptive devices andgiving contraceptive advice to married persons in violation of a Connecticut statute. They challenged the constitutionality ofthe statute, which made it unlawful to use any drug or medicinal article for the purpose of preventing conception, on behalf ofthe married persons with whom they had a professional relationship. The Supreme Court held that the statute wasunconstitutional because it was a violation of a person's right to privacy. In his opinion, Douglas stated that the specificguarantees of the Bill of Rights have penumbras "formed by emanations from those guarantees that help give them life andsub-stance," and that the right to privacy exists within this area. Since Griswold, the penumbra doctrine has primarily been used to represent implied powers that emanate from a specificrule, thus extending the meaning of the rule into its periphery or penumbra.

Principles of Construction and Chevron Deference "'[A]s a general matter, courts should be loath to announce equitable exceptions to legislative requirements or prohibitions that are unqualified by the statutory text[.'] Although trust law may offer a 'starting point' for analysis in some situations, it must give way if it is inconsistent with 'the language of the statute, its structure, or its purposes.'" Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 447 (1999) (quoting Guidry v. Sheet Metal Workers Nat. Pension Fund, 493 U.S. 365, 376 (1990), and Varity Corp. v. Howe, 516 U.S. 489, 497 (1996)). "[T]he meaning of statutory language, plain or not, depends on context." Holloway v. United States, 526 U.S. 1, 7 (1999) (quoting Brown v. Gardner, 513 U.S. 115, 118 (1994), and King v. St. Vincent's Hospital, 502 U.S. 215, 221 (1991)). "We look first to evidence of the original understanding of the Constitution." Alden v. Maine, 527 U.S. 706, 741 (1999) "[E]arly congressional practice * * * provides 'contemporaneous and weighty evidence of the Constitution's meaning.'" Alden v. Maine, 527 U.S. 706, 743-744 (1999) (quoting Printz v. United States, 521 U.S. 898, 905 (1997) (internal quotation marks omitted)). "When interpreting a statute, we look first to the language." Richardson v. United States, 526 U.S. 813, 818 (1999). "As in any case of statutory construction, our analysis begins with the language of the statute. * * * And where the statutory language provides a clear answer, it ends there as well." Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 438 (1999) (citation and internal quotation marks omitted). "The Secretary's reading of [the statute] frankly seems to us the more natural - but it is in any event well within the bounds of reasonable interpretation, and hence entitled to deference under Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842 (1984)." Your Home Visiting Nurse Services, Inc. v. Shalala, 525 U.S. 449, 453 (1999). "But Congress is well aware that the ambiguities it chooses to produce in a statute will be resolved by the implementing agency, see Chevron [U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837,] 842-843 [1984]. We can only enforce the clear limits that the 1996 Act contains * * *." AT&T Corp. v. Iowa Utilities Bd., 525 U.S. 366, 397 (1999). "Under Chevron, if a court determines that 'Congress has directly spoken to the precise question at issue,' then 'that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" United States v. Haggar Apparel Co., 526 U.S. 380, 392 (1999) (quoting Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-843 (1984)). "If, however, the agency's statutory interpretation 'fills a gap or defines a term in a way that is reasonable in light of the legislature's revealed design, we give [that] judgment "controlling weight."'" United States v. Haggar Apparel Co., 526 U.S. 380, 392 (1999) (quoting NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co., 513 U.S. 251, 257 (1995)). "A statute may be ambiguous, for purposes of Chevron analysis, without being inartful or deficient." United States v. Haggar Apparel Co., 526 U.S. 380, 392 (1999). "For purposes of the Chevron analysis, * * *[a statute is ambiguous if] the agency must use its discretion to determine how best to implement the policy in those cases not covered by the statute's specific terms." United States v. Haggar Apparel Co., 526 U.S. 380, 393 (1999). "[Chevron] [d]eference can be given to the regulations without impairing the authority of the court to make factual determinations, and to apply those determinations to the law, de novo." United States v. Haggar Apparel Co., 526 U.S. 380, 391 (1999). "Because the Court of Appeals confronted questions implicating 'an agency's construction of the statute which it administers,' the court should have applied the principles of deference described in Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842 (1984). Thus, the court should have asked whether 'the statute is silent or ambiguous with respect to the specific issue' before it; if so, 'the question for the court [was] whether the agency's answer is based on a permissible construction of the statute.' Id. at 843." INS v. AguirreAguirre, 526 U.S. 415, 424 (1999). "[W]e have recognized that judicial deference to the Executive Branch is especially appropriate in the immigration context where officials 'exercise especially sensitive political functions that implicate questions of foreign relations.' INS v. Abudu, 485 U.S. 94, 110 (1998). A decision by the Attorney General to deem certain violent offenses committed in another country as political in nature, and to allow the perpetrators to remain in the United States, may affect our relations with that country or its neighbors. The judiciary is not well

positioned to shoulder primary responsibility for assessing the likelihood and importance of such diplomatic repercussions." INS v. Aguirre-Aguirre, 526 U.S. 415, 425 (1999). The Board of Immigration Appeals "should be accorded Chevron deference as it gives ambiguous statutory terms concrete meaning through a process of case-by-case adjudication * * *." INS v. Aguirre-Aguirre, 526 U. S. 415, 425 (1999) (internal quotation marks omitted). "[W]e have no occasion to review the call for deference here [to a construction of the agency's statutory jurisdiction first advanced in the government's Supreme Court brief], the interpretation urged in [that] brief being clearly the better reading of the statute under ordinary principles of construction." California Dental Assn. v. FTC, 526 U.S. 756, 766 (1999). "In resolving this issue, the [Federal Labor Relations] Authority was interpreting the statute Congress directed it to implement and administer. 5 U.S.C. § 7105. The Authority's conclusion is certainly consistent with the [statute] and, to the extent the statute and congressional intent are unclear, we may rely on the Authority's reasonable judgment." National Aeronautics and Space Admin. v. Federal Labor Relations Authority, 527 U.S. 229, 234 (1999). "In interpreting statutory mineral reservations like the one at issue here, we have emphasized that Congress 'was dealing with a practical subject in a practical way' and that it intended the terms of the reservation to be understood in 'their ordinary and popular sense.'" Amoco Production Co. v. Southern Ute Tribe, 526 U.S. 865, 873 (1999) (quoting Burke v. Southern Pacific R. Co., 234 U.S. 669, 679 (1914)). "It is a well-established rule of construction that '"[w]here Congress uses terms that have accumulated settled meaning under . . . the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms."'" Neder v. United States, 527 U.S. 1, 21 (1999) (quoting Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 322 (1992), and Community for Creative NonViolence v. Reid, 490 U.S. 730, 739 (1989)). "'[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed.'" Kolstad v. American Dental Assn., 527 U.S. 526, 539 (1999) (quoting Morissette v. United States, 342 U.S. 246, 263 (1952)). "If a given statute is unclear about treating * * * a fact as [an] element [of the offense] or [a] penalty aggravator [in sentencing], it makes sense to look at what other statutes have done, on the fair assumption that Congress is unlikely to intend any radical departures from past practice without making a point of saying so." Jones v. United States, 526 U.S. 227, 234 (1999). "Statutory language must be read in context and a phrase 'gathers meaning from the words around it.'" Jones v. United States, 527 U.S. 373, 389 (1999) (quoting Jarecki v. G.D. Searle & Co., 367 U.S. 303, 307 (1961)). A statutory phrase "should ordinarily retain the same meaning wherever used in the same statute * * *." National Aeronautics and Space Admin. v. Federal Labor Relations Authority, 527 U.S. 229, 235 (1999) (agreeing to principle but rejecting argument based on this maxim). "Now and then silence is not pregnant." El Paso Natural Gas Co. v. Neztsosie, 526 U.S. 473, 487 (1999) (explaining that Congress probably failed to provide for tribal-court removal in Price-Anderson Act actions because Congress never expected the situation to arise).